I'm pleased to be seated Mr. Stravko. Thank you your honor for your consideration here today in your time on behalf of the appellant Clarence Griffin. I am Thomas Stravko. This is a matter that's boiled down to the singular issue of constitutional standing. It's a matter of constitutional standing as it relates to the accessibility of websites by the visually impaired. Blind individuals may access websites by using keyboards in conjunction with screen access software that reads the websites, vocalizes visual information and allows the visually impaired individual to surf the app, the website, to access the different parts of the website and so forth. The Department of Labor Federal Credit Union owns and operates a website dolfcu.org which provides among other things information concerning the Federal Credit Union's locations it operates, information and descriptions of its amenities, services, eligibility criteria and allows users to find locations of ATMs and essentially the physical locations of the site of the Federal Credit Union. And then we have of course Title III of the ADA and Title III of the ADA under 42 U.S.C. 12181 provides that no individual shall be discriminated against on the basis of services, facilities, privileges, etc. This is a case in which the district court erred by failing to take a broad view of the constitutional standing as mandated by the Supreme Court in the Traficante case. In Doran v. 711, that case held that the Supreme Court has instructed courts to take a broad view of constitutional standing on civil rights matters, especially whereas under the ADA private enforcement suits as brought here by Mr. Griffin. Does it make any difference to you that you have six district courts in Virginia, all of whom reflect a variety of perspectives and every one of those six district courts have ruled against you and as I understand it none have ruled in your favor? Does something like that have a sobering effect? Well, I appreciate the question, Your Honor. You know, this is a very concerning area of the law. A blossoming area of the law. It is. Which means we should be pushing the envelope and crawling out on the far edge. No, we need only rely upon established Fourth Circuit precedent to be able to get through this case, Your Honor. I'm confident of that. However, there have been a number of district court decisions that are not binding precedent. And what's good for the goose is good for the gander. I'm going to be talking about some district court decisions that, again, are not binding authority, some outside of this circuit, but provide effective guidance on how to weigh the current matter. It's this court's decision here today, not a district court's. Does it make a difference to you that this is a credit union whose membership is restricted and whose members actually own the union? That is a precise and perfectly worded question, Your Honor. And it doesn't. So it was, too. Yeah, it's good. Good job. It doesn't matter. It doesn't matter. As I've indicated regarding what kind of threshold the party needs to be to be able to bring forth a Title III ADA case of public accommodations, it's merely that the person be an individual. And the district court erred by seemingly applying It's not eligible for membership. Well, but that's not required. In the PGA tour case in the U.S. Supreme Court that's specifically held Most of the cases about testers and everything, the classic cases involve housing projects and development units where you're concerned about knock on the door and be rejected over and over again. But in that kind of case, the tester and the individuals that they may or may not be sort of representing are all likely to be eligible for renting a unit that's open to the public. But here's a closed loop. Not necessarily, Your Honor. And may I add just a little bit to your hypothetical to make it more analogous to the current matter? That would include saying that, let's put it to a disability. This person is perhaps African-American, but they're in a wheelchair. And perhaps this apartment complex or housing authority requires, let's say, Section 8 requirements. It may have some sort of eligibility or criteria for who may and who may not have an apartment there. And let's say that the ability to find out that within the rental office. And the rental office has no accessibility for any individual to gain access to the rental office. But this isn't a matter of the apartment's eligibility rules. I understand that this was a matter of federal law that the credit union was going to be limited to DOL employees and to the members of their families. Right, Your Honor. You're nailing it. But the thought here is... It's a matter of federal law. Like you said, it's not a matter, just a minute ago, it's not a matter of the eligibility of apartment requirements. And it's not a matter of membership. It's not a matter of eligibility for membership within the credit union. It's not. That would require a patronage. It's a matter of the fact that if they were to give you a mortgage, they'd be in violation of the statute out there, which was passed in 1934, the Federal Credit Union Act. And if they were to make a loan or give you a mortgage, they'd be in violation of federal law. So it's a bit of an odd thing to say I mean, by virtue of federal law, cannot expect to be a member of. Because part of it, part of standing, I mean, part of the law of case of controversy is some idea of redressability at the end of the road. And even if they ruled in your favor, even if we were to rule in your favor, that still wouldn't make you eligible. And, you know, I suppose there are other aspects of redressability you could say, but that's certainly an important one. Even if we were to rule in your favor, you still couldn't be a member of the union. And it's not that I don't have sympathy for individuals with disabilities and for this disability in particular. I do. I understand it. And it's something that is a matter of the heart. It has a real pull. But it just seems to me that if we grant standing in a situation where someone isn't eligible to join the organization that they sued, because it's owned by DOL employees, members and everything, that we really just throw this open, throw open standing so wide that there's no constitutional barrier to any kind of suit anywhere. And we begin to sort of dilute the case of controversy requirement to the point of nothingness. Your Honor, I don't feel that. That is not what is occurring here. And to follow the proper legal analysis in reversing this case, that one would not have to open up standing as large and as wide as you've This is not a watering down of standing. This is standing as applied and looked through the lens of Title III of the Americans with Disabilities Act. But isn't this different from suing a restaurant or suing a bank where, you know, you could one day hope to become a, you might one day want to become a depositor, or you might one day, you might as a depositor want to know whether a bank was wheelchair accessible or could be utilized by those who had some sort of sight impairment, or a restaurant that you might want to go to one day. But this seemed to me different from a restaurant or a bank where you would hope to What if you couldn't get into the restaurant to see what was on the menu? What if you couldn't get into the bank to see whether or not the accounts were actually competitive with other banks? What if Mr. Griffin wanted to access the website to see what the eligibility requirements may actually be as it relates to this credit union? But he doesn't plead, and there's nothing in the record, that he was contemplating utilizing the credit union services. And indeed, he wouldn't be eligible. And it seems to me that's the difference in your analogy. Your apartment analogy, sure, there may have been something unknown regarding Section 8 eligibility, but in that situation, the person at least had the possibility, or he thought he had a possibility of utilizing whatever, you know, services or having an apartment there. This is one that if you're right, you don't have to have any possibility or any thought to, you could sit here and get on a website for a credit union in Alaska and claim it violates something when you have no conceivable way of utilizing their services, don't you? Isn't that the extension of what you're saying? I'd like to, not precisely, Your Honor, I'd like to characterize this case in the recent Fourth Circuit case of Nonnie versus Aberdeen Marketplace. Nonnie is the precedent in this case. In Nonnie, you had a tester, you had an individual who was physically traveling to a location and was barred from getting into that location. And in the pleadings, that individual indicated that they were likely to go there again. In this case, it's all about access. In this case, we have an individual who is denied access, has indicated that he will go back to that place, to that website again. Denied access to the website. Website. To the website. You're talking about the website. Right. But the Nonnie case, this is where the Credit Union building. Right. But this is where the court, this is where the district court totally misconstrued the Nonnie case. Because the district court stated that in Nonnie, the plaintiff had indicated that he would go back to the physical location. That's not what the Nonnie court said. The Nonnie court said to that particular location, not physical location. It's not, it's implying a brick and mortar requirement that's not needed. That nexus is not required here. It's about access. It's about the ability to get access, to obtain information, to even know. Is that what the ADA is about, access? In this case, it is. As applied to public accommodations, it is. Because Does he have to be a member of this plaintiff? It does. The ADA does not, does not, the application of who may bring a Title III complaint is not as narrowed as that. It's just an individual. Does he have to want to use their services or something? He has to, the discrimination is not the denial of a sought-after benefit. Discrimination is exposure to unequal treatment. And that's an 11th Circuit case, the wound gets You don't have access to the website. Yes, sir. Yes, Your Honor. Did the district court address that? Pardon? Did the district court here address that particular point? The district court, in construing the Nonnie case, implied that there probably would have to be a physical, a visit to a physical location or something along those lines. But that's not a requirement of the ADA. Let me mention one thing here. The Supreme Court, I think, is getting stricter on these applications. I'm sorry, I didn't hear that, Your Honor. The Supreme Court is becoming, getting stricter on the, on requiring, on standing requirements. And the recent Spokio case said that, okay, what you're arguing on the Title III and everything is the possibility of, I might add, a rather remote or technical statutory violation. And the Supreme Court is saying that there is a difference between statutory violations and they don't, they don't always suffice to grant constitutional standing. And constitutional standing has to reflect some sort of real or concrete injury or the imminent threat of an injury. And some real, as opposed to theoretical concept of redressability. In other words, you have to have something real and concrete in terms of an injury. And then you, and you, and you have to have something real and imminent in terms of a threat of an injury. And you have to have some real relief that can be at the end of the road with the lawsuit. And all that could be satisfied here. All of these, all of these things seem to be missing because what you're asking is not only that we buy off on informational and dignitary standing, but something on the far edges of informational or dignitary standing. Something that is a theoretical injury, if even that. And I just don't think that the Supreme Court's looking for concreteness in standing. And here we are presented with a concept of standing that is altogether abstract. Your Honor. I know you say it's not abstract and I hear you. It's not abstract to someone with a sight impairment. I understand that. But that again has, you know, it is critical that any, any small business can be sued from any person's home computer in any, in any, in any person's study in America. As you, as my colleague Judge Qualbaum has pointed out, somebody can be sitting in South Alaska or Washington or Oregon and then, wham, I've got standing and file a complaint to have them redo their website. There's, there's absolutely no limit to it. Even if the individual didn't show any desire to order from the website in any way, it's just, it's so open-ended. It just, it just almost vaporizes. I appreciate your description, Your Honor. I respectfully disagree. The, there, there is an actual injury. The, this does not open up some sort of floodgate scenario. It is not an undue burden for even a small employer to have their website comply with WCAG. I'm a small employer. I made sure my website would comply with it. It's not hard to do. And you can't, it is an injury to prevent an, anybody to be able to access information regarding public accommodations without giving unequal treatment to that access to other individuals. Is there a circuit split on the issue you're trying, you're presenting here today? There is, Your Honor, there's the, the 11th, there's a number of cases. I have to say that the Fourth Circuit is, is quiet on a number of these. It's quiet, but there's a circuit split among the courts of appeals. Yes, Your Honor. And what's the, what's the vote? Three to three or something like that? I believe you're right, Your Honor, on that. I, I, I believe you're correct on that, Your Honor. Three to three. What are you, are you talking, what's, what are you talking about when you say circuit split? Are you talking about credit union situations where there's no possibility of being a member? No, there's district court rulings on that, Your Honor. I understand, but the circuits, they haven't addressed a case like this at all, have they? Well, Your Honor, it, it, the, I would argue that the, hold on one second, the 11th Circuit in the Houston case. Whether the ADA applies to websites. Yeah, that's. Whether, well, the DOJ has long held for the last 20 years that the, that the, that the ADA applies to websites. That plenty of courts disagree. And, but that's not, that, that, that, that issue's not even up, I mean, this is about standing. It's not, you know, it's the issue about, you know, whether it's a public accommodation. You're citing for the circuit split the Minkowitz case, for example, in that case. Out of the Third Circuit. The, the, the, but in that case, the, the plaintiff, I thought, was a, a physician that had staff privileges at the hospital. Who was not a patron of the hospital. He was allowed. He had staff privileges. And, but, but Your Honor, that doesn't discern this case from, that doesn't discern. That's, isn't that a much more concrete connection? If you have staff privileges at a hospital? I, I mean, Your Honor. Isn't that a more concrete connection than is present here? The district court ruled in this case that because he couldn't be a member to patronize this, this establishment that he didn't have standing. In the Minkowitz case, the healthcare provider, the physician was not a patron. That, that's, that's the ruling. That's the theme. But there's no, there's no connection here. The connection is that he's denied access and that he's, and that he's indicated he's going to go back there. Is he denied access to the website or to the credit union? Yes. Does it, it, to the website. But that is not a distinction that matters. That's what I'm talking about. My question went about denial of access to the website. How is he even going to know where the... I thought there was a circuit split. How is he even going to know where the physical location is if he can't get the information from the website? He doesn't allege that. You've, you've, you've pled three deficiencies. It's not like the website, as I understand the pleading, doesn't afford some ability for a sight impaired person to utilize it. In your pleadings, you only talk about three deficiencies that don't talk about the situation you just said, like in terms of where it would be. Well, we talk, respectfully, Your Honor, we talk about what information will be characterized on the website. And because he can't gain access, we don't know, I mean, what, I mean, that, that's the whole point. You're, the, the, the information about the deficiencies you have alleged are in paragraph 13 of your complaint, correct? Okay. I've, y'all have kept me a little bit over my time. I love being up here. You've got some rebuttal time. Thank you. So why don't you just save it and believe me, we'll let you back on. Appreciate it. Thank you. Thank you. All right. Well, let's hear from the other folks here. Mr. Bredehoft. Thank you. Good morning, Your Honor. And may it please the court. My name is John Bredehoft. I represent the Department of Labor, Federal Credit Union. And I'd like to adopt Judge Wilkinson's comments as my oral argument. And if there are any questions? No. Your Honor, you, I think, have it exactly correct. The only issue here, and Judge King, you wrote the Nany opinion, and I think you'll appreciate this, the only issue here is what concrete injury this individual could possibly have suffered. And what is the redressability of that injury? And I think, especially after the Spokale case, where the Supreme Court made very, very clear that a mere technical violation of a statute, which we do not agree we've committed, a mere technical violation of a statute is not concrete injury. It has to be both particularized and concrete, and that's where this fails. I think it's very clear that this person, Mr. Griffin, cannot patronize our credit union. I cannot patronize our credit union. I don't know if members of the court can patronize our credit union. And if we look at the complaint and we see what the theme of the complaint is, it's that he can't, because of our website, patronize the credit union. The allegations of the complaint, paragraph three, joint appendix at five, this has deterred the plaintiff from visiting the credit union's locations. Paragraph four, have to find what services it offers to potential customers. He isn't one. He can't be one. It would violate federal law for us to accept his money. And it's throughout the complaint, paragraph 10, paragraph 15, deterred from visiting physical locations. Paragraph 14, finding locations to visit, finding out what services, privileges, advantages are. He's not allowed to use them. Now, I do want to spend a second, if I may, before I go into Nannie and some of the other cases, first, there is no circuit split on this credit union issue. The first slew of cases were filed in Virginia. They uniformly, with one exception where the individual was a member of the field, they uniformly were dismissed on standing. And actually, to go to Judge Quarlebon's question about Alaska, counsel filed, on behalf of a different plaintiff who lives in northern Virginia, cases against banks, who have to take everybody, in Roanoke. And those were dismissed on standing, based on the straightforward principles that this court articulated in Nannie. Now, there are some of these cases out there from Georgia and from Michigan. I understand the two Michigan ones, they've petitioned for appeal. And I don't know. District court cases. District court cases. And I don't know what that means. But I do know that even in those cases, which are in these supplemental authorities that were filed, by and large, the court dismissed any attempt to get an injunction because there was no allegation that they would go there in the future. And I think Judge Quarlebon, you pointed out the absence of that allegation in this complaint. There's no allegation that the plaintiff would use the services in the future. So, even in the Georgia case, the Michigan cases, they dismissed, or dismissed with leave to amend in one case, dismissed the complaint so far as they sought injunctive relief. Okay. That's all this plaintiff can seek. In Michigan, there was also a Michigan state law claim, which gives you damages. So that's why those cases weren't dismissed. I want to know how you think this case lines up with Spokio, because I thought, my reading of Spokio was a technical statutory injury did not necessarily suffice to produce constitutional standing. That was something over and above a technical statutory violation. And what we're looking for is something that's concrete and something that's real and something that's particularized and something that is individualized. And by individualized, it means something that separates you from the 300 million other people who are members of the general public. In other words, they're asking for purposes of standing. Okay. What makes you different? What differentiates you? And the thing that has to differentiate you is your connection to the individual institution or whatever it is that you're suing. Now, of course, what differentiates you in one sense is that you are disabled or a member of a minority group or what have you, but I think that in terms of the differentiation the Supreme Court was looking for was a differentiation that drew its roots from Article III and the case and controversy requirement that there be something real that the parties are fighting about and not something that is essentially fictional. That's exactly right. And I think Spokio is exactly on point to this. And the court's opinion in Spokio even said at page 1549, article three standing requires a concrete injury, even in the context of a statutory violation. See, since 1983 and the Lyons case, we've been hearing from the Supreme Court and I think your Honor's comment earlier is correct, the court is getting tighter on this and I think it should be getting tighter on this, we've been hearing that injury has to be both concrete and particularized. The Spokio case is the first time the court told us, okay, this is what that means, here you have a particularized injury because there was a technical violation of the statute that affected you, but even so it is not a concrete violation because you did not suffer an injury in kind, you did not suffer an injury different from any person who would be, you know, on the street, which is, one thing brings me back to something I wanted to mention about the case involving the physicians, and that's the Domenkiewicz case in the Third Circuit about staff privileges. Yeah, you don't have to be a customer of the hospital. But he had staff privileges, that's why he had standing. I couldn't sue the hospital over staff privileges there because I'm not a doctor. It's the same thing in the PGA case. That's a pretty important connection to have staff privileges at a hospital. Absolutely. It is concrete, it is concrete and that's what distinguishes that case from this case, it distinguishes that case from Spokio, it distinguishes the PGA case, which was not a standing case, it was a statutory construction case. In order to sue the PGA to let Mr. Morton go around without his cart, he had to qualify for the PGA. He wanted to play. He was qualified to play. He paid us $3,000, he'd gone through the qualifying tournament. And didn't the court in PGA, the Supreme Court say, it didn't say that was not a requirement? It said that Casey Morton was, in one respect, one of the constituents or one of the clients or customers. There was both the public who come to watch and then there's the other group of people who aspire to play. Absolutely. You have to be a member of this credit union to use an ATM machine? To use its ATM machine? Use an ATM machine that it operates? No. No. You probably, unless you're a member of this credit union or another credit union that has an ATM sharing agreement, you have to be a member to use it free. So, I mean, there are things that are open to members that are not open to non-members, but the ATM machine's ubiquity, you don't have to be a member. I think I probably have used their ATM machine. Is there a, I think the answer's no with the Fourth Circuit and I think the answer's no also with other circuits. A case where the party claiming a violation of the ADA had no likelihood or ability to go to the store or go to the hospital. I know tester liability doesn't, is not an automatic barrier to standing, but as I read the cases, you still have to have standing even if you were a tester and I didn't see an appellate court case where we have a situation like here where the plaintiff did not indicate a desire to utilize the business at all. I believe that's correct, Your Honor. There have been so many ADA cases. I can't, I haven't read them all. There are probably 10,000 of them, but I've heard a good share of them and they all come out the other way. They come out as this court did in Nannie with the fact that the individual went to the store several times. It wasn't that he didn't have access to the store in Nannie. It's that he had to be, he alleged, very careful in going down the aisles to avoid physical injury. And there he wanted access to the physical store. Yes, sir. The mall along the interstate up there in Maryland. Yes, sir. And he, and he. Well, he wanted to go to the bathroom. Right. He wanted to go to the bathroom. Because it was on the way from his house up in Maryland, right on the side of the road. There he wants access to the internet, to the website. And, and he has access to the website, quite frankly. The three complaints that are pled in the complaint, which are the same as, as far as I can tell, that have been pled in every complaint in the country and these district court cases from the other circuits say. These things look like they're almost being mimeographed or something. Well, I mean, perhaps. There is a fellow out in California who is an associated counsel on many of these things. I've had some discussions with him. He's a very nice person. But when I first got a demand letter for one of my credit union clients, I called him up and I said, you shouldn't be suing credit unions because unless your people are in the membership field, it violates federal law for us to do anything for you. But he went ahead with the credit unions anyway. What if he wanted to go down the street and go to the, get some money out of a machine, wanted to see if you had one. He can't. I mean, the three specific... He wanted to see where the machine was. You need to access your website to see where the machine was. Well, you are... That's what I'm talking about. ATM, I'm talking about. We were just talking about, you said that non-members can use your ATM. Absolutely understood. And... Was that pled? That was not pled. It was pled, the access to the individual locations was pled. Website is what he's pled, right? No, he's pled. He needs to find, read the website so he can find our... He needs to read the website. He needs to read the website. That's what I'm talking about. So he can find our locations in order to determine what services we offer. The service, he wants to see whether you have an ATM on the corridor. Look at the websites if you have an ATM. If that's a concrete injury or... So he can go get some... DOL... Machine, if you've got one of those cards that work, isn't it? The DOL FCU only has, I think, two ATMs and they're both inside secure federal buildings. So that's not any place in the record. So don't rely on it. You have to look at the website to see what you have. To get the information. To see... If he wanted to use one of our websites... To see where schools are and to see where... Go ahead, I'm sorry. But I know, I understand. And that was my first reaction when we thought about this argument a year and a half ago. What about ATMs? And the reason it's not important is because using... I was the first one who thought about that. Not well. I'm sure I was just channeling, Your Honors. What would have you wrote, Britton, in the Denani case if it had been about ATMs? There are so many ATMs. They are ubiquitous. The fact that he, you know, sitting at home and says, I want to find a Department of Labor ATM. I mean, that's not... I don't think it's a concrete injury under Spokane. There are millions of ATMs. But that's what he said in Nani. He said he didn't have to go to the bathroom at this spot. Indeed, there was one down the interstate. There was a rest area. But in Nani... He could just as well stop at the rest area and go to the bathroom as he could get off of the interstate two miles up the road at this other place and go to the bathroom. Well, they said there's a bathroom right down the road. Your Honor wrote it and I only read it. Well, there's another ATM down the street. Your Honor wrote Nani and I only read it. But what you wrote was that in order to have standing there... I don't remember talking a lot about it. It was a few months ago. Well, luckily I wrote some of it down. I'll vouch for it. I absolutely wrote it. And part of the standing, part of the allegations that gave him standing was that he had a plausible plan to return to that specific market, use its goods and services, and there was future denial of access to the marketplace goods and services. It's not just looking for another place to go to the bathroom. But that was what specifically we talked about was that bathroom, the goods and services included to go into the men's room. That's right. But he also bought things. He was in a wheelchair. And he also bought things there and he worked his way down the aisles and everything. But I'd like to get back to something that Judge Parabon mentioned, which is what are the allegations here? And the allegations are not that you can't read this thing. The allegations are that some linked image is missing alternative text. What that means in English is for some of the pictures, if you roll your mouse over it, it doesn't read to you what the picture is. Okay? And this website has very few pictures. Second, there are redundant links, which means you click on two different things, they take you to the same place. That annoys me too, but it has very little to do with visual acuity. And third, there are some empty or missing form labels. Okay? Well, he won't be filling out any forms because he can't get any of our goods and services, so that has no bearing here. None are related to finding locations or services or even related to finding the ATMs. None of those, and we actually made an Iqbal motion about this saying that there was no connection between the allegations and the harm. But I think it's also pertinent to standing redressability, that sort of thing. It's not that this organization, as the complaint might be read to say, hates blind people. I mean, heavens to Betsy, Department of Labor employees have a fairly large number of individuals with impairments and disabilities. And it's not that they're consciously committing some sort of statutory violation. I mean, we think we're in compliance with the statute. These three things that are pled aren't in any statute. There are no regulations on this. The Department of Justice was required, if this is covered by the ADA, and that's a separate argument, but it was required to issue regulations in 1991. It thought about it. It issued an advance notice of proposed rulemaking in 2010, and then it withdrew it the day after Christmas this past year. There are no regulations on this. So we're left to, you know, what are we going to do? One of the things, in fact, the only thing the Department of Justice recommended in the advance notice of proposed rulemaking was put something on your website that gives people a number to call if they can't read it all. And we have that. And that's in the brief. Heavens to Betsy. I mean, and, you know, if I'm right. Thank you, sir. You've covered your argument pretty well, haven't you? I think so. I mean, I had some fairly interesting knock-knock jokes, but I think I can defer them for the beginning. Thank you, Your Honor. I appreciate your time. We thank you. All right. Mr. Stroka, let's hear. From you in rebuttal. Sure. Thank you, Your Honor. I will be brief. Mr. Stroka, let me just ask you one thing here. I think all members of the panel have indicated that we have a great deal of respect for the ADA and the purposes that the Americans with Disabilities Act serves. It's a very important piece of social legislation. But if you had wanted to go after the deficiencies of a website in terms of accessibility, couldn't you have found a much stronger case than this where somebody had some connection to the website or some connection to the company that was sponsoring the website or some connection to do business with the website or something, but I mean, this seems like just the most, it almost seems like you scoured the woods for the most attenuated connection you could possibly find. And I don't get it. There wasn't an intended purpose to look for any sort of tenuous case or case on thin ice. And comparing this case to any of the other cases that Mr. Griffin or any of these other testers may have brought or that have settled it, you know, we have to be here on this case, on this case alone. If we granted standing in this case, we would make standing a null point. I mean, there would be no standing. I mean, there would be no case that I could envision where there would be no standing. Standing in every single case, no matter how attenuated the connection with the individual and the person that they're suing, one of the things about a case in controversy is there's some connection between the plaintiff and the defendant. They may not even know each other, but there's still some connection through an accident or mishap or somebody has dealt somebody wrong in some way. But there is a connection between A and B. And that's so basic to a case in controversy. That's where you get the idea of a controversy. Deterrence can cause an injury, in fact, that is in comportion with spokio. Deterrence in this case, deterring Mr. Griffin from being able to even know what possible services are there, where any ATM locations might be, he does not have access. Deterrence is the discriminatory injury. Your Honors, I'd also like to inform the court, if the court wasn't aware. I don't think that's going to pass muster these days under spokio. I mean, I'm trying to save you from yourself. Do you really want to go up there before the Supreme Court and argue that your decision is consistent with spokio? I mean that. To expand the Americans with Disabilities Act where it needs to be, where it should be, where it has to be. Yes, Your Honor, I would do that. And I wouldn't feel bad about doing it. I wouldn't feel embarrassed to bring this argument, Your Honor. I want to, I want to indicate that in front of the court, there is another case on appeal right now in front of the fourth, it's Carol versus Northwest. It's 18-1434. That case talks about the issue that you were bringing up, Judge Qualbaum, about the issue of whether or not the website itself can be an area of public accommodations. So I just wanted to inform the court that that was a case that's currently pending. It also involves a Title III tester. Has that been argued? Not yet. Briefed? The briefing has not yet been, it has been briefed? I can't recall. Sorry. Your Honor, the briefing has been completed. This week we received notice from the court that the hearing on that would be held in advance and in this court's house. Okay. Yeah. But we, to that point, if you got by the standing issue, then you'd address the issue of whether or not the website itself can be an area of public accommodation. Right. And whether the deficiencies you claim here would violate the ADA. Standing first. Yeah. Okay. Are those issues before this court? The only issue before this court is standing. Okay. That's it. Constitutional standing. I believe the court is aware of my arguments and assertions to this point. I'm happy to answer any other question that you have. I do thank you for your time. Well, we thank you very much as well. And we'll come down, greet counsel, and then we'll move into our final case.
judges: J. Harvie Wilkinson III, Robert B. King, A. Marvin Quattlebaum Jr.